## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SUSAN A.,**<br><br>    **Plaintiff,**<br><br>    v.<br><br>**COMMISSIONER OF SOCIAL SECURITY,**<br><br>    **Defendant.** | Civ. No. 21-07949 (KM)<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

Plaintiff Susan A. brings this action to review a final decision of the Commissioner of Social Security ("Commissioner") denying her claims for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security ("SSI"). Upon reviewing and weighing certain evidence, the Administrative Law Judge ("ALJ") concluded that Susan A. was not disabled from April 20, 2018, the onset date of the alleged disability, through July 1, 2020, the date of decision.

The issue presented is whether the ALJ's decision is supported by substantial evidence. For the reasons stated below, I hold that the Commissioner's finding as to the applicant's RFC is supported by substantial evidence, but the decision is **REVERSED** and **REMANDED** on the issue of work in the national economy that the applicant can perform.

### I.    BACKGROUND[1]

Susan A. applied for DIB pursuant to Sections 216(i) and 223(d) of the Social Security Act ("SSA"), and for SSI pursuant to Section 1614(a)(3)(A) of the

---

[1]    Citations to the record are abbreviated as follows:

DE = docket entry

AR. _ = Administrative Record (DE 8) (the cited page numbers correspond to the number found in the bottom right corner of the page for all DE 9 attachments)

SSA on June 18, 2018, alleging disability beginning as of April 20, 2018. (AR. 15.) Her application was denied initially then upon reconsideration. (AR. 15, 134-139, 144–151.) On July 16, 2019, Susan A. filed a request for a hearing before an ALJ to review her application de novo. (AR. 15, 152-155.) A telephone hearing was held on April 23, 2020, before ALJ Leonard F. Costa, who issued a decision on July 1, 2020.

Susan A. requested Appeals Council Review of ALJ Costa's decision, but her request was denied on February 9, 2021. This denial rendered ALJ Costa's decision the final decision of the Commissioner. (AR. 1–6.) Susan A. now appeals that decision, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II. DECISION FOR REVIEW

### A. The Five-Step Process and this Court's Standard of Review

To qualify for Title II DIB benefits and for SSI disability, a claimant must meet the insured status requirements of 42 U.S.C. § 423. To qualify, a claimant must show that she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted (or can be expected to last) for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(c), 1382(a).

Under the authority of the SSA, the Social Security Administration (the "Administration") has established a five-step evaluation process for determining whether a claimant is entitled to benefits. 20 C.F.R. §§ 404.1520, 416.920. This Court's review necessarily incorporates a determination of whether the ALJ properly followed the five-step process, which is prescribed by regulation. The steps may be briefly summarized as follows:

> **Step 1:** Determine whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. 20 CFR §§ 404.1520(b), 416.920(b). If not, move to step two.

---

Pl. Br. = Susan A.'s Moving Brief (DE 12)

**Step 2:** Determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c), 416.920(c). If the claimant has a severe impairment, move to step three.

**Step 3:** Determine whether the severe impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 CFR Pt. 404, Subpt. P, App. 1, Pt. A. If so, the claimant is automatically eligible to receive disability benefits (and the analysis ends); if not, move to step four. *Id.* §§ 404.1520(d), 416.920(d).

**RFC and Step 4:** Determine the claimant's "residual functional capacity" ("RFC"), meaning "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). *Caraballo v. Comm'r of Soc. Sec.*, 2015 WL 457301, at *1 (D.N.J. Feb. 3, 2015). Decide whether, based on her RFC, the claimant can return to her prior occupation. 20 C.F.R. § 1520(a) (4)(iv); *Id.* §§ 404.1520(e)–(f), 416.920(e)–(f). If not, move to step five.

**Step 5:** At this point, the burden shifts to the Administration to demonstrate that the claimant, considering her age, education, work experience, and RFC, is capable of performing jobs that exist in significant numbers in the national economy. 20 CFR §§ 404.1520(g), 416.920(g); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91–92 (3d Cir. 2007). If so, benefits will be denied; if not, they will be awarded.

On appeal, the Court conducts a plenary review of the legal issues. *See Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). Factual findings are reviewed "only to determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). Substantial evidence is "less than a preponderance of the evidence but more than a mere scintilla." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citation omitted). "It means such

3

relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* When substantial evidence exists to support the ALJ's factual findings, this Court must abide by the ALJ's determinations. *See id.* (citing 42 U.S.C. § 405(g)).

This Court may, under 42 U.S.C. § 405(g), affirm, modify, or reverse the Commissioner's decision, or it may remand the matter to the Commissioner for a rehearing. *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984); *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 865–66 (3d Cir. 2007). Outright reversal with an award of benefits is appropriate only when a fully developed administrative record contains substantial evidence that the claimant is disabled and entitled to benefits. *Podedworny*, 745 F.2d at 221–222; *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000).

Remand is proper if the record is incomplete, or if there is a lack of substantial evidence to support a definitive finding on one or more steps of the five-step inquiry. *See Podedworny*, 745 F.2d at 221–22. Remand is also proper if the ALJ's decision lacks adequate reasoning or support for its conclusions, or if it contains illogical or contradictory findings. *See Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119–20 (3d Cir. 2000); *Leech v. Barnhart*, 111 F. App'x 652, 658 (3d Cir. 2004) ("We will not accept the ALJ's conclusion that Leech was not disabled during the relevant period, where his decision contains significant contradictions and is therefore unreliable."). It is also proper to remand where the ALJ's findings are not the product of a complete review which "explicitly weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994) (internal quotation marks omitted).

### B. The ALJ's Decision

ALJ Costa undertook the five-step inquiry. His conclusions are summarized as follows:

### Step 1

ALJ Costa concluded that Susan A. had not engaged in substantial gainful activity since April 20, 2018, the alleged onset date. (AR. 18.)

4

### Step 2

The ALJ found that Susan A. had the following severe impairments: status post lumpectomy for Stage II breast cancer and subsequent radiation therapy and lymphedema of the right arm; major depressive disorder; and generalized anxiety disorder. (AR. 18.) With respect to Susan A.'s psoriasis, however, the ALJ concluded that the record did not establish "that [psoriasis] has not caused more than minimal limitation in the claimant's ability to perform basic work activities for 12 consecutive months relevant to this decision." (AR. 18.) Because the ALJ found that Susan A. suffered from several severe impairments, he proceeded to step three.

### Step 3

With respect to Susan A.'s severe impairments, the ALJ determined that she did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR. 17.) The ALJ paid particular attention to Listings 13.10 (Cancer of the Breast), 12.04 (Depressive, Bipolar and Related Disorders), and 12.06 (Anxiety and Obsessive-Compulsive Disorders).

First, ALJ Costa declined to find that Susan A. met the criteria for Listing 13.10 (Cancer of the Breast), because the record "does not document locally advanced cancer of the breast; carcinoma with metastases to the supraclavicular or infra-clavicular nodes, to 10 or more axillary nodes, or with distant metastases; recurrent carcinoma; small-cell carcinoma; or secondary lymphedema that is caused by anticancer therapy and treated by surgery to salvage or restore the functioning of an upper extremity, that would meet or equal the listing." (AR. 18.)

Second, the ALJ determined that Susan A.'s mental impairments, both individually and in combination, did not meet the criteria of Listings 12.04 (Depressive, Bipolar, and Related Disorders) and 12.06 (Anxiety and Obsessive-Compulsive Disorders). (AR. 19.) Specifically, the "paragraph B" criteria were not satisfied. To satisfy "paragraph B" criteria, a claimant's mental impairments "must result in at least one extreme or two marked limitations in

5

a broad area of functioning which are: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves." (AR. 19.)[2]

In particular, the ALJ found that the medical evidence demonstrates that Susan A. had only moderate limitations in the areas of "understanding, remembering, or applying information" and "concentrating, persisting, or

---

[2]    A claimant's affective disorder meets or medically equals listing 12.04 (Depressive, bipolar and related disorders) when it either satisfies both the paragraph A and paragraph B criteria, or the paragraph A and paragraph C criteria. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04.

To satisfy the paragraph A criteria, a claimant must, in essence, medically document the persistence of depressive or bipolar syndrome. 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.04. To satisfy the Paragraph B criteria of listing 12.04, a claimant must demonstrate that her affective disorder results in "extreme limitation of one, or marked limitation of two" of the following areas of mental functioning:

   1. Understand, remember, or apply information.

   2. Interact with others.

   3. Concentrate, persist, or maintain pace.

   4. Adapt or manage oneself.

   *Id.*

"'Marked' as a standard for measuring the degree of limitation ... means more than moderate but less than extreme." *Id.* § 12.00.

Listing 12.04, Paragraph C states:

> Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both: (1) Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and (2) Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(C). *See generally Trzeciak v. Colvin*, No. CV 15-6333 (KM), 2016 WL 4769731, at *7 (D.N.J. Sept. 12, 2016).

maintaining pace," as well as mild limitations "in interacting with others" and "adapting or managing oneself." (AR. 19.)

The ALJ also found that the evidence: (1) failed to "establish the presence of 'the paragraph C' criteria because medical treatment diminishes the signs of [Susan A.'s] mental disorders, and [Susan A.] has more than minimal capacity to adapt to changes in her environment"; (2) "does not show such marginal adjustment that [Susan A.] has minimal capacity to adapt to changes in the environment or some new demands"; and (3) does not demonstrate "that simple changes or increased demands have led to a deterioration of [Susan A.'s] functioning or inability to function outside the home." (AR. 19.)

### RFC and Step 4

Next, ALJ Costa defined Susan A.'s RFC:

> [T]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), with exceptions. The claimant cannot perform overhead reaching with the dominate right arm. She is unable to lift or carry weights in excess of 10 pounds with the right arm. She can occasionally push/pull controls with the upper extremities. She can frequently handle and finger objects with the right hand. She is able to understand, remember and carry out simple instructions with only occasional changes to essential job functions and is able to make simple work-related decisions."

(AR. 20.)

ALJ Costa began his RFC analysis by laying out the prescribed two-step process. First, he was required to determine whether Susan A. had an underlying medically determinable physical or mental impairment "that can be shown by medically acceptable clinical and laboratory diagnostic techniques— that would reasonably be expected to produce [Susan A.'s] pain or other symptoms." (AR. 20.) Second, the ALJ was required to "evaluate the intensity, persistence, and limiting effects of [Susan A.'s] symptoms to determine the extent to which they limit [her] work-related activities." (AR. 20.) This evaluation required him to look to objective medical evidence, or to the entire case record, where objective medical evidence does not substantiate Susan A.'s

7

statements about "the intensity, persistence, and limiting effects of pain or other symptoms." (AR. 20.)

ALJ Costa concluded that while Susan A.'s "medically determinable impairments reasonably could be expected to cause symptoms and limitations," to the extent Susan A. alleges that "the intensity, persistence, and limiting effects of her symptoms result in disability," her statements were not consistent with the record. (AR. 21.)

Beginning with Susan A.'s physical symptoms, ALJ Costa noted that on April 20, 2018, a routine mammogram screening revealed that Susan A. had "heterogeneously dense breasts and a 1.5 cm density at the right lower inner quadrant deep." (AR. 21.) Because of these findings, Susan A. went for an additional mammogram and ultrasound on May 4, 2018, which revealed: (1) "a spiculated mass at the right lower breast measuring 13 x 21 mm"; (2) "a hypoechoic mass at the right 5-6 o'clock axis, 6 cm from the nipple, and an adjacent 12 mm nodule"; and (3) "a left breast cyst at 2 o'clock, which was too small to characterize." (AR. 21.) Susan A. was ultimately diagnosed with right breast cancer. (AR. 21.)

According to Susan A.'s March 29, 2019 progress notes, in 2018, Susan A. "underwent lumpectomy with reduction mammoplasty on the opposite side followed by radiation to the right breast." (AR. 21) Susan A.'s radiation treatment concluded in December 2018; however, because Susan A. was suffering from "some left-sided chest pain," she visited a cardiologist. (AR. 21.) During this visit, as part of a workup, Susan A. also revealed an abnormal "calcium score CAT scan," which "led to a CT scan of the chest showing a right upper lobe nodule." (AR. 21.)

Since her appointment with the cardiologist, Susan A.'s "chest pain has subsided." (AR. 21.) The ALJ noted that during an evaluation, Susan A. stated that, in retrospect, "she had a very minimal non bothersome cough" over the past "couple of months," along with "some rhinorrhea." (AR. 21.) On the other hand, Susan A. "was not short of breath at rest or with exertion," and the chest pain she previously complained of was resolved. (AR. 21.) Ultimately, Dr.

Frederic Scoopo's assessment was that Susan A. "had a lung nodule, that may be an inflammatory nodule status post radiation therapy, or possible early scarring from radiation." (AR 21.)

By February 3, 2020, according to Dr. May Abdo-Matkiwsky's medical records, Susan A. had no ongoing treatment events. (AR. 22.) While Susan A. reported fatigue, she also reported "no generalized weakness, fair appetite, no sleep disturbance, and no night sweats or hot flashes." (AR. 22.) Moreover, while Susan A. "had ongoing rheumatologic issues and psoriatic arthritis[,] … [o]ther auto-immune disorders and hypothyroidism had been effectively treated." (AR. 22.)  Finally, according to March 12, 2020 medical records, Susan A.'s "right-sided breast cancer was noted to be in remission." (AR. 22.)

ALJ Costa also considered Susan A.'s mental impairments. The ALJ cited Dr. Paulette Sabol's February 14, 2019 psychological consultative examination report, in which Susan A. "reported symptoms of depression since she was diagnosed with cancer." (AR. 22.) Susan A. also stated that: (1) her tamoxifen was "making her feel sad"; (2) she felt "tearful more than usual"; (3) she felt irritable; (4) she had lost "interest in regular activities such as cleaning, gardening, and organizing"; (5) "she has difficulty sleeping … because of pain and worry"; (6) experienced "psychomotor slowing"; and (7) had "difficulty concentrating and remembering information." (AR. 22.) On the other hand, Susan A. denied "suicidal ideation" or "auditory or visual hallucinations." (AR. 22.)

The ALJ noted that Dr. Sabol reported that Susan A.'s "demeanor and responsiveness to questions were pleasant and cooperative." (AR. 22.) Further, Susan A.'s "manner of relating, social skills, and overall presentation were adequate" and that her "thought processes were coherent and goal directed with no evidence of hallucinations, delusions, or paranoia in the evaluation setting." (AR. 22.) Dr. Sabol expressed, however, that Susan A. "seemed to process information slowly" and that her "affect was tearful." (AR. 22). Susan A.'s mood was also described as "anxious and depressed" and that her "recent

9

and remote memory skills were impaired possibly because of [her] depression." (AR. 22.)

Nevertheless, according to Dr. Sabol, Susan A. was still able to "name simple objects correctly," "understand and carry out simple directions," "read and write a coherent sentence and copy a design correctly." (AR. 22.) The medical report described Susan A.'s intellectual functioning as "in the average range," "her general fund of information [a]s appropriate to her experience, and her insight and judgment as "fair." (AR. 22.) "Dr. Sabol's psychological impressions included major depressive disorder, recurrent, moderate, without psychotic features; generalized anxiety disorder; and rule[d] out mild cognitive impairments." (AR. 22.)

In assessing Susan A.'s RFC, the ALJ also reviewed opinion evidence as to both her physical and mental impairments. The ALJ found the opinion of the DDS medical consultants to be "somewhat persuasive" and "somewhat consistent" with the overall medical record. (AR. 23.) The DDS consultants found that Susan A. could "occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand/walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday," along with postural limitations. (AR. 23.) Further, the DDS consultants described Susan A. as having "moderate limitations" in "understanding, remembering, or applying information" and "concentrating, persisting and maintaining pace," as well as having "mild limitations" in "interacting with others" and "adapting or managing oneself." (AR. 23.) However, ALJ Costa noted that while the DDS consultants examined the medical record and cited supporting evidence, the consultants never observed Susan A. personally and did "not incorporate the entirety of [her] limitations." (AR. 23.) Ultimately, the ALJ determined that the DDS consultants' opinions were "somewhat consistent" with the medical record. (AR. 23.)

ALJ Costa also cited Dr. Gary Mascilak's medical opinion with respect to Susan A.'s ability to perform physical work-related activities. (AR. 23.) Dr. Mascilak reported that Susan A. could "lift and carry less than 10 pounds; sit

10

less than 2 hours in an 8-hour workday; stand and walk less than 2 hours in an 8-hour workday; [could] never crouch; limited in pushing/pulling overhead; and would be absent from work more than three times per months." (AR. 23.) Nonetheless, the ALJ stated that while Dr. Mascilak's opinion was based on his personal examination and observation of Susan A., in his view, the opinion lacked "adequate rationale or supporting evidence for such great limitations, especially the opinion as to absences per month." (AR. 23.) Overall, the ALJ stated that the report was "somewhat consistent" with the medical record. (AR. 23.)

Finally, the ALJ cited Dr. Sabol's medical opinion as to Susan A.'s mental impairments. (AR. 23.) According to Dr. Sabol, Susan A. has "major depressive disorder and generalized anxiety," with a "fair" prognosis. (AR. 23.) Dr. Sabol also stated that Susan A. is "able to follow and understand simple directions," "perform tasks independently," "maintain attention and concentration," although noting that Susan A. "may have difficulty maintaining a regular schedule due to anxiety." (AR. 23.) ALJ Costa expressed that while Dr. Sabol's opinion was based on her personal examination of Susan A., it "was only a one-time evaluation." (AR. 23-24.) The ALJ described Dr. Sabol's opinion as being "somewhat consistent with the record reflecting that [Susan A.] severe mental impairments resulting in some limitations." (AR. 24.)

**Step 5**

At step five, ALJ Costa explained that "considering the claimant's age, education, work experience, and residual functional capacity," there were other jobs that existed in significant numbers in the national economy that the claimant could have performed. (AR. 24.)[3] The ALJ relied on the testimony of a vocational expert, who testified that Susan A. would have been able to perform the following representative occupations: Retail Marker (Dictionary of Occupational Titles ("DOT")) 209.587-034; Mail Sorter, (DOT) 209.687-026, and

---

[3] The ALJ also found that Susan A. could perform past relevant work as an office assistant in light of her RFC. AR. 24.

11

Laundry Attendant, (DOT) 361.687-030. (AR. 25.) All three occupations are classified as light, unskilled work, and there are between 110,000 and 130,000 positions in these three occupations in the United States. (AR. 25.)[4]

Accordingly, the ALJ concluded that Susan. A. was not disabled from April 20, 2018, the onset date of the alleged disability, through July 1, 2020, the date of decision.

## III. DISCUSSION

### A. Evaluation of Opinion Evidence

Susan A. claims that the ALJ's "weighting" of Dr. Mascilak's medical opinion was unreasonable, thus requiring remand. (Pl. Br. at 23.) In Dr. Mascilak's medical opinion, Susan A. could "lift and carry less than 10 pounds; sit less than 2 hours in an 8-hour workday; stand and walk less than 2 hours in an 8-hour workday; [could] never crouch; limited in pushing/pulling overhead; and would be absent from work more than three times per month." (AR. 23.) Although Dr. Mascilak's personally examined Susan A., the ALJ found that (1) there was not "adequate rationale or supporting evidence" for the extent of his limitations, especially "as to absences per month" and (2) his opinion was "somewhat consistent" with the record. (AR. 23.)

Because Susan A.'s claim was filed after March 27, 2017, the relevant regulations eliminated the hierarchy of medical source opinions that gave preference to the opinions of treating sources. *Compare* 20 C.F.R. § 404.1527 *with* 20 C.F.R. § 404.1520c(a) (providing, *inter alia*, that the Commissioner will no longer "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources"). Rather than assigning weight to medical opinions, the Commissioner instead articulates "how

---

[4] As to the number of jobs for the listed representative occupations, ALJ Costa also stated that the number reflected "a 50% reduction due to the claimant being unable to lift or carry weights in excess of 10 pounds with the right arm." AR. 25.

12

persuasive" he or she finds the medical opinions. 20 C.F.R. §§ 404.1520c(b), 416.920c(b).

The Commissioner's consideration of medical opinions is guided by the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization of the medical source; and (5) any other factors that tend to support or contradict the opinion. 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). However, the "supportability" and "consistency" of the opinion are considered the most important factors for the Commissioner's consideration. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). Indeed, while the ALJ *may* explain his or her consideration of the other factors, the ALJ *must* explain how he or she considered the "supportability" and "consistency" of a medical source's opinion. *Id.* Nevertheless, the ALJ need not rely on a specific medical opinion, as the ALJ makes the ultimate disability and RFC determinations.[5]

The Court finds that ALJ Costa's explanation of the "supportability" and "consistency" of Dr. Mascilak's opinion both (1) complied with the governing regulations and (2) is supported by substantial evidence. As previously stated, the ALJ did not believe that Dr. Mascilak's opinion provided the requisite rationale or supporting evidence to justify the proposed limitations and absences from work. When asked "[w]hat medical findings support[ed] the limitations," Dr. Mascilak only stated "see treatment notes." (AR. 1731-33.) And with respect to work absences caused by Susan A.'s impairments, Dr. Mascilak indicated "[m]ore than three times a month," although noting that it "[d]epends on work, as a hair stylist >3x/month." (AR. 1733.)

---

[5]   *See Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011) ("The ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations."); *Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006) (there is no current "legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC [residual functional capacity]"); *Mays v. Barnhart*, 78 F. App'x 808, 813 (3d Cir. 2003).

A review of Dr. Mascilak's treatment notes indicates that he only treated Susan A.'s *right shoulder* (AR. 546-81, 622-76, 1683-1730); therefore, based on these treatment notes, the ALJ determined that Dr. Mascilak did not provide the necessary support for his proposed limitations, which included drastically limiting how often Susan A. could sit, stand, and walk in an 8-hour workday. This finding is supported by substantial evidence. As Susan A. reported in her function report, while she complained that her surgery caused "difficulty in [her] right shoulder and … trouble with [a] full range of motion and tight muscles in the right side of [her] neck," she did not indicate that her impairments adversely affected her ability to squat, bend, stand, walk, sit, or kneel, (AR. 256-271.) Moreover, Susan A. testified that her limitations are currently "not being able to lift [her] arm, not being able to cross it or cross [her] shoulder without pain" (AR. 46), although also stating that she was able to walk and sit with necessary accommodations to her right arm. (AR. 55-56.) Finally, the DDS consultants found that Susan A. was capable of standing, walking, and sitting for about 6 hours in an 8-hour workday—although the ALJ similarly classified their opinions as "somewhat consistent" with the record and noted that the consultants failed to "incorporate the entirety of the claimant's limitations," most notably with respect to her right shoulder. (AR. 23.)

The Court finds that the ALJ's RFC determination was based on a thorough discussion of the medical evidence, and not merely a lay opinion. Indeed, Susan A.'s RFC is largely consistent with Dr. Mascilak's treatment records, with the ALJ finding that she could not (1) "perform overhead reaching with the dominate right arm" or (2) "lift or carry weights in excess of 10 pounds with the right arm." (AR. 20.) Moreover, the ALJ ultimately determined that Susan A. *could not* work in her old occupation as a hairdresser; therefore, Dr. Mascilak's opinion as to Susan A.'s absences from work—based on her working as a hairdresser—is of minimal value.

Accordingly, based on the evidence in the record and the ALJ's stated reasons, I find that the ALJ's determination of how much weight to give the

medical opinions was supported by substantial evidence in the record. I thus affirm the determination as to Susan A.'s RFC.

### B. Conflict Between VE's Testimony and the DOT

More substantial is Susan A.'s challenge to the ALJ's determination that she can perform either (1) her past relevant work as an office assistant or (2) work that exists in significant numbers in the national economy. In determining Susan A.'s RFC, ALJ Costa found that she was "able to understand, remember, and carry out simple instructions with only occasional changes to essential job functions and … make simple work-related decisions." (AR. 20.) Susan A. argues, however, that there is a conflict between the ALJ's mental impairment-related limitations and the jobs identified by the vocational expert, Richard Hall, during the April 23, 2020 telephonic hearing. While the ultimate decision of the ALJ might well have a substantial basis, I will remand so that inconsistency can be explained or resolved.

Mr. Hall testified that given Susan A.'s RFC, she would be capable of performing her past job as an office assistant, along with the representative jobs of a retail marker, mail sorter, or laundry attendant, classified as light, unskilled work. (AR. 60-61). Nevertheless, when asked by Susan A.'s counsel whether her "limitation to simple instructions … would preclude the ability to carry out *detailed written and oral instructions*," Mr. Hall answered in the affirmative. (AR. 62 (emphasis added).) According to Susan A., Mr. Hall's testimony created a direct conflict between [her] RFC limitation, because the reasoning level requirements of her prior employment and the other jobs cited by the ALJ exceed those in her RFC. (Pl. Br. at 18.)

Susan A. submits that her prior office assistant job, along with the retail marker and the laundry attendant jobs, have a General Educational Development ("GED") reasoning level of 2. A reasoning level of 2 requires an individual to be able to "[a]pply commonsense understanding to carry out *detailed* but uninvolved written or oral instructions" and "[d]eal with problems

15

involving a few concreted variables in or from standardized situations." (Pl. Br. at 12 (emphasis added).)[6]

Susan A. claims that neither the ALJ nor Mr. Hall explained how someone (1) limited to simple instructions and (2) unable to "carry out detailed written and oral instructions" could perform the GED level 2 representative jobs which "require the ability to handle *detailed instruction*s." (Pl. Br. at 18 (emphasis added).) This, Susan A. argues, violates SSR 00-4p, which requires the ALJ to "[i]dentify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs … and information in the [DOT]."[7]

---

[6] The DOT "is a vocational dictionary that lists and defines all jobs available in the national economy and specifies what qualification are needed to perform each job." *Zirnsak v. Colvin*, 777 F.3d 607, 617 (3d Cir. 2014) (citing DOT, Appendix C, www.occupationalinfo.org/appendxc_1.html (other citations omitted). To that end, the DOT lists qualification categories for each job, which includes the job's (1) Strength level, (2) GED level, and (3) Specific Vocational Preparation ("SVP") level.

GED level measures "those aspects of education (formal and informal) which are required of the worker for satisfactory job performance" and is broken into three specific categories: (1) reasoning development; (2) mathematical development; and (3) language development. *Id.* (citing Appendix C). At issue here, reasoning development, comprises levels 1 through 6. *Id.* Relevant to the instant action:

> Level 3 reasoning is: Apply commonsense understanding to carry out instructions furnished in written, oral, or diagrammatic form. Deal with problems involving several concrete variables in or from standardized situations.

> Level 2 reasoning is: Apply commonsense understanding to carry out detailed but uninvolved written or oral instructions. Deal with problems involving a few concrete variables in or from standardized situations.

> Level 1 reasoning is: Apply commonsense understanding to carry out simple one-or two-step instructions. Deal with standardized situations with occasional or no variables in or from these situations encountered on the job.

DOT, Appendix C.

[7] *See* SSR 00-4p, 2000 WL 1898704, at *1 (Dec. 4, 2000); *see also* Pl. Br. at 19 ("When there is such an apparent unresolved conflict between the VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict

16

In response, the government attempts to salvage the ALJ's admittedly inconsistent ruling by citing the so-called *Zinsak* factors: (1) whether the plaintiff "seriously argue[s] that she is incapable of performing the jobs recommended by the VE," (2) whether the plaintiff's "counsel [ ] identif[ied] any inconsistencies between the VE's testimony and the DOT at her hearing," and (3) whether "the jobs listed by the VE were only representative examples—not an exhaustive list—of jobs that the [plaintiff] was capable of performing" (hereinafter, "*Zirnsak* factors"). *See Ana M. v. Comm'r of Soc. Sec.*, No. CV 21-7780 (SDW), 2022 WL 1639206, at *8 (D.N.J. May 23, 2022) (citing *Zirnsak*, 777 F.3d at 618-19). The Third Circuit has thus authorized a finding of harmless error in a proper case.[8]

On the first *Zirnsak* factor, as to Susan A.'s ability to perform prior relevant work or the jobs that the vocational expert identified during the hearing, it is not a sufficient answer that Susan A. was found capable of performing "unskilled" work. To be sure, there are items in the record that *could* support such a determination.[9] I am not satisfied, however, that the

---

before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disable.").

[8]  *See Zirnsak*, 777 F.3d at 617 ("[T]his Circuit has emphasized that the presence of inconsistencies does not mandate remand, so long as substantial evidence exists in other portions of the record that can form an appropriate basis to support the result."); *Jackson v. Barnhart*, 120 F. App'x 904, 906 (3d Cir. 2005) (citations omitted) ("[E]ven if it was error for the ALJ to fail to solicit testimony about potential conflicts between this portion of the VE's testimony and the DOT, the error was harmless. Where substantial evidence supports the ALJ's opinion and where the failure to solicit the testimony contemplated in SSR 00–4p is harmless, this court will not reverse the ALJ's decision.").

[9]  For example, Dr. Sobel reported that she was able to (1) "understand and carry out simple directions," (2) "read and follow directions," and (3) "write a coherent sentence and copy a design correctly." (AR. 22.) Dr. Sabol also reported that Susan A.'s intellectual function is "in the average range," her "general fund of information" to be appropriate with her experience, and that she had fair insight and judgment. (AR. 22.) Indeed, Dr. Sabol's report is consistent with the DDS consultants who described Susan A. as having only "moderate limitations" in "understanding, remembering, or applying information" and "concentrating, persisting, and maintaining pace." (AR. 23.)

17

relevant evidence was considered and weighed in relation to jobs that exist in the national economy—or at least as to the particular jobs cited by the VE. This Court should not in the first instance perform that function, which is committed to the sound discretion of the ALJ, guided by the expertise of the VE.

On the third *Zinsak* factor, a review of the hearing transcript does make it clear that the representative jobs were proffered as examples—not an exhaustive list—of the jobs that Susan A. could perform. (AR. 59, 61.) That, of course, is nearly always the case; a VE does not generally list every job in the national economy that an applicant could perform.  Again, I do not suggest that the ALJ could not reach the same conclusion on remand, but the record does not place this Court in a position to posit or identify jobs other than the "examples" that Susan A. could perform.

On the second *Zirnsak* factor, I have already identified a conflict or inconsistency between the VE's conclusions and the DOT.

In sum, I am unable to determine whether the ALJ, guided by the VE, actually and adequately considered and resolved the issue of jobs this applicant could perform. I am unwilling to construct a hypothetical ruling from items in the record which the ALJ should be considering in the first instance. I will therefore remand for clarification and resolution of the apparent inconsistency.

## IV. CONCLUSION

For the reasons set forth above, I hold that the Commissioner's finding as to the applicant's RFC is supported by substantial evidence, but the decision is **REVERSED** and **REMANDED** on the issue of work in the national economy that the applicant can perform. In remanding, I do not suggest an outcome or purport to limit the ALJ's resolution of this issue. A separate order will issue.

Dated: June 27, 2022

/s/ Kevin McNulty

———————————————
**Hon. Kevin McNulty**
**United States District Judge**